STATE OF CONNECTICUT *v.* KATHLEEN
PAMELA LAVIGNE
(AC 29098)

DiPentima, Harper and Lavine, Js.*

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued December 7, 2009—officially released May 18, 2010

*Ruth Daniella Weissman,* special public defender, for the appellant (defendant).

*Melissa L. Streeto,* assistant state's attorney, with whom, on the brief, were *Kevin T. Kane,* chief state's attorney, and *Brenda Hans,* assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, J. The defendant, Kathleen Pamela Lavigne, appeals from the judgment of conviction, rendered after a jury trial, of larceny in the second degree by embezzlement from a person who is sixty years of age or older in violation of General Statutes § 53a-123 (a) (5). On appeal, the defendant claims that (1) the evidence was insufficient for conviction, (2) the court's instructions to the jury were improper and (3) § 53a-123 (a) (5) is unconstitutionally vague as applied to the circumstances of this case.[1] We affirm the judgment of the trial court.

[1] The defendant also claims, in the alternative, that a violation of § 53a-123 (a) (5) was a "legal impossibility." We decline to review this claim. Because the defendant simply relies on the argument she makes for her void for vagueness claim without any additional legal analysis, it is briefed inadequately. See *State* v. *Clark,* 255 Conn. 268, 281 n.30, 764 A.2d 1251 (2001) ("[c]laims on appeal that are inadequately briefed are deemed abandoned" [internal quotation marks omitted]).

The jury reasonably could have found the following facts. In February, 2002, the defendant went to Nashua, New Hampshire, to visit the home of the victim, her aunt, Cleopatra Matlis. Matlis, who was then eighty-seven years old, was born in New Hampshire and had lived there until 2002. On or about February 19, 2002, Matlis left New Hampshire and traveled with the defendant to Connecticut. On that same date, before departing from New Hampshire, the defendant and Matlis visited two banks in Nashua. At the first bank, the defendant removed stock certificates from a safe deposit box. At the second bank, Fleet Bank, Matlis withdrew $10,000 in cash. Once in Connecticut, the defendant and Matlis visited other banks and created accounts that named them as joint account holders. These accounts were opened with money obtained from accounts that were previously in the name of Matlis alone, as well as the proceeds from the sale of stocks that had been in Matlis' name. Two months later, on April 15, 2002, using Matlis' money for the down payment, the defendant purchased a house in Ellington. The defendant and Matlis lived together in this new house. The state alleged that over the next several months, Matlis' spending habits changed dramatically. Prior to that, between February 27 and March 4, 2002, Matlis cashed stock certificates that she had inherited from her father, totaling $134,063.49. On August 2, 2002, the defendant executed a listing agreement with a realtor for the sale of Matlis' home in Nashua.

On October 4, 2002, Matlis was diagnosed with primary degenerative dementia. On October 10, 2002, the Ellington Probate Court found that she was incapable of managing her affairs because of her dementia and that irreparable injury to her financial and legal affairs would result if a temporary conservator was not appointed. The Probate Court appointed attorney Steven Allen as the temporary conservator of her estate.

On November 7, 2002, Allen accepted his appointment as permanent conservator of the estate and person of Matlis. Between October 10 and 22, 2002, the defendant withdrew approximately $3307 from two checking accounts jointly held by Matlis and the defendant at Savings Bank of Manchester. Matlis died on November 18, 2002.

On January 25, 2007, the state filed an amended information charging the defendant with five counts of larceny in the first degree in violation of General Statutes § 53a-122 (a) (2) and five counts of larceny in the second degree in violation of § 53a-123 (a) (2) and (5). A jury trial began on February 13, 2007, and on March 27, 2007, the defendant was found guilty of one count of larceny in the second degree in violation of § 53a-123 (a) (5).[2] The court declared a mistrial as to the nine remaining counts. On May 30, 2007, the defendant was sentenced to five years imprisonment, execution suspended after six months, and five years probation. She also was required to pay $3307 restitution to the estate of Matlis as a condition of probation. This appeal followed.

I

First, the defendant claims that the evidence was insufficient to support her conviction under § 53a-123 (a) (5).[3] More specifically, the defendant argues that the evidence was insufficient to prove that (1) an October 10, 2002 withdrawal took place, (2) the defendant was or should have been aware that the accounts had been put under the control of the Probate Court, or that she did not dispense those funds for Matlis' benefit and (3) the defendant did not remove the money intending to use it for the care of Matlis. We disagree.

[2] An earlier trial, which had begun on October 23, 2006, resulted in a mistrial.

[3] At the close of the state's case, the defendant moved for a judgment of acquittal on all charges. That motion was denied, as was the renewed motion made at the completion of all the evidence.

"A claim of insufficient evidence implicates the constitutional right not to be convicted on inadequate proof. . . . We review this claim first as it may be dispositive of the appeal . . . because a defendant convicted on insufficient evidence cannot be retried without violating the double jeopardy clause." (Citations omitted; internal quotation marks omitted.) *State v. Sitaras*, 106 Conn. App. 493, 498–99, 942 A.2d 1071, cert. denied, 287 Conn. 906, 950 A.2d 1283 (2008).

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State v. Atkins*, 118 Conn. App. 520, 526, 984 A.2d 1088 (2009), cert. denied, 295 Conn. 906, 989 A.2d 119 (2010).

Furthermore, our Supreme Court has stated that "it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require

acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Calabrese*, 279 Conn. 393, 402–403, 902 A.2d 1044 (2006).

"[W]e are mindful that the trier of fact is the arbiter of credibility." *State* v. *Wilson*, 118 Conn. App. 556, 562, 984 A.2d 114 (2009). When presented with a challenge to the sufficiency of the evidence, we note that "[i]n considering the evidence introduced in a case, [triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Fauntleroy*, 101 Conn. App. 144, 153, 921 A.2d 622 (2007).

Section 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . (5) the property, regardless of its nature or value, is obtained by embezzlement, false pretenses or false promise and the victim of such larceny is sixty years of age or older . . . ." General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to: (1) Embezzlement. A person commits embezzlement when

he wrongfully appropriates to himself or to another property of another in his care or custody." We will address each of the claims regarding insufficient evidence in turn.

## A

The defendant first asserts that "no proof was offered" as to the October 10, 2002 withdrawal. The defendant argues that two of the state's exhibits, specifically eighty-three and eighty-four, were insufficient to prove this fact and that because of this insufficiency, her conviction cannot stand. This claim warrants little discussion.

The defendant's argument on this issue is limited to a single sentence: "Exhibits [eighty-three and eighty-four] fail to show that count ten's allegation about a $1000 starter check on [October 10, 2002] ever took place."[4] The state asserts that the defendant's argument is misplaced because the state's case did not rest on an October 10, 2002 withdrawal and because its burden of proving count ten was satisfied by exhibit ninety-two. We agree. State's exhibit ninety-two consists of bank records from two accounts held jointly by the defendant and Matlis at Savings Bank of Manchester showing: (1) a mortgage check for $1184.26 dated October 15, 2002, (2) a $600 cash withdrawal on October 17, 2002, (3) a check made out to "cash" for $1122.94 dated October 22, 2002, and (4) a check made out to "cash" for $445.85 dated October 22, 2002. Therefore, exhibit ninety-two is sufficient to show withdrawals

---

[4] Exhibit eighty-three consists of bank records for Savings Bank of Manchester Gold Money Market Account 9501348911 ranging from March 7 through October 25, 2002. The monthly statement for October 25, 2002, shows a check written for $1000 on October 10, 2002, but the check image is unavailable. It also shows a check for $1122.94 made out to "cash" on October 22, 2002. Exhibit eighty-four consists of additional bank records, specifically, copies of checks written against Savings Bank of Manchester Money Market Account 9501348984.

in the amount that the defendant was charged with embezzling in count ten, that is, approximately $3307 between the dates October 10 and 22, 2002.

B

Next, the defendant claims that the evidence was insufficient to show that the defendant was or should have been aware that the Savings Bank of Manchester accounts had been put under the control of the Probate Court. We disagree.

Allen testified, as to persons deemed incompetent, that "the conservator acts in their stead and is in charge of all their affairs. There's a conservator of estate, which handles all financial aspects for a person, and a conservator of person, which handles the health issues." When asked if he met the defendant on October 14, 2002, Allen responded by stating: "I believe she was [present]. My notes in the file don't reflect her attendance or nonattendance. My recollection is, I did meet with her several times in the hospital during that October time period." In addition, in response to the inquiry of what he discussed with the defendant, he stated: "I believe I would have identified myself, told her what my role was and my responsibilities and that, in a sense, I was now legally in charge. Any previous powers of attorneys or other legal agreements had been overruled by the conservatorship." Allen also testified that it would be in his normal course of business to ask family members such as the defendant about financial assets of a ward. Allen, however, was unable to testify with certainty as to the dates that he spoke with the defendant and the actual information that he discussed with the defendant. On the basis of this evidence, the jury heard sufficient evidence from which it could reasonably infer that the defendant knew that Matlis' assets, including her interest in the Savings Bank of Manchester account, were under the control of the conservator.

## C

Last, the defendant alleges that the evidence was not sufficient to show that the money was appropriated wrongfully.[5] More particularly, the defendant claims that the evidence was not sufficient to show that she removed the money not intending to benefit Matlis. In support of this claim, the defendant refers to the fact that Matlis was in the hospital and that the defendant expected that Matlis eventually would return to the defendant's house, and, thus, the jury reasonably could have inferred that the money could have been intended for the upkeep of the house for Matlis' benefit.

A thorough review of the record reveals that the state presented sufficient evidence to show wrongful appropriation. Among other things, the evidence reflected the defendant's interactions with Matlis, other family members, bank employees and other important witnesses from February, 2002, through Matlis' death in November, 2002; the character and habits of Matlis; the circumstances surrounding the changes in Matlis' financial status throughout that time, including bank accounts, spending habits and stock holdings; and Matlis' physical and mental health throughout the relevant time period. Further, the state presented evidence to show that the defendant knew that Matlis' estate was under a conservatorship, that she had been notified of her duty to report to the conservator all accounts held by Matlis, whether in joint or sole ownership, and that she did not do so. Therefore, we conclude that the jury heard sufficient evidence from which it reasonably

---

[5] The defendant also seems to make a separate claim that the evidence was insufficient to show that the defendant did not remove the funds from the Savings Bank of Manchester account for Matlis' benefit. This claim is based on the same facts and legal principles as the claim that the evidence was not sufficient to show that the defendant did not remove the money with the intent to care for Matlis. Therefore, we consider both claims as included in this analysis.

could infer that the defendant withdrew the $3307 at issue from the joint bank accounts with the requisite wrongful intent to constitute the crime of larceny in the second degree.

## II

The defendant next claims that the court's instructions to the jury were improper because the defendant cannot be held criminally liable under § 53a-123 (a) (5) as a joint account holder of the account in question. More specifically, she argues that the court improperly instructed the jury to determine the ownership of the funds jointly held by her and Matlis. We do not agree.

The specific facts underlying the charge in count ten involve approximately $3307 that the state alleges the defendant wrongfully obtained between October 10 and 22, 2002, from two Savings Bank of Manchester accounts that were at that time jointly held by Matlis and the defendant.

The defendant concedes that the issue of instructional error was not raised at trial and requests review under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). A defendant can prevail on an unpreserved constitutional claim under *Golding* "only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id. "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks

omitted.) *State* v. *Peeler*, 271 Conn. 338, 360, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). We conclude that the claim is reviewable because the record is adequate to review the claim of instructional error, and the claim is of constitutional magnitude. See *State* v. *DeJesus*, 260 Conn. 466, 472–73, 797 A.2d 1101 (2002) ("[a]n improper instruction on an element of an offense . . . is of constitutional dimension" [internal quotation marks omitted]).

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Wallace*, 290 Conn. 261, 272–73, 962 A.2d 781 (2009).

The defendant cites General Statutes § 36a-290[6] for guidance, claiming that the bank protection statute does

---

[6] General Statutes § 36a-290 provides in relevant part: "(a) When a deposit account has been established at any bank, or a share account has been established at any Connecticut credit union or federal credit union, in the names of two or more natural persons and under such terms as to be paid to any one of them, or to the survivor or survivors of them, such account

not prove that either party to the joint account had superior rights over the funds in the account. We agree that § 36a-290 and the case law interpreting the statute do not prove conclusively that either party has the right to withdraw funds from a jointly held bank account, but we conclude that the court properly instructed the jury on the law of joint accounts.

Prior to instructing the jury, the court engaged in a thorough discussion with counsel, outside the presence of the jury, regarding the portion of the instructions related to the issue of the law regarding joint accounts. It then charged the jury regarding the rights of joint account holders as follows: "Owner means not only the true or lawful owner, but any person who has a superior right to that of the offender. . . . A joint owner or a common owner of property would not be guilty of larceny of that property where he or she took it from the other owner. . . . To appropriate property of another to one's self or a third person means to exercise control over it or to aid a third person to exercise control over it permanently or for so extended a period or under such circumstances as to acquire the major portion of the economic value or benefit, or to dispose of the property for the benefit of one's self or a third person.

---

is deemed a joint account, and any part or all of the balance of such account, including any and all subsequent deposits or additions made thereto, may be paid to any of such persons during the lifetime of all of them or to the survivor or any of the survivors of such persons after the death of one or more of them. Any such payment constitutes a valid and sufficient release and discharge of such bank, Connecticut credit union or federal credit union, or its successor, as to all payments so made.

"(b) The establishment of a deposit account or share account which is a joint account under subsection (a) of this section is, in the absence of fraud or undue influence, or other clear and convincing evidence to the contrary, prima facie evidence of the intention of all of the named owners thereof to vest title to such account, including all subsequent deposits and additions made thereto, in such survivor or survivors, in any action or proceeding between any two or more of the depositors, respecting the ownership of such account or its proceeds. . . ."

Now, in this case there is evidence that money belonging to . . . Matlis was deposited into joint bank accounts between the defendant and . . . Matlis. Under Connecticut law, money deposited into a joint bank account does not necessarily equate to joint ownership. The statute governing joint bank accounts is one that was written to provide joint access to money in these accounts and to protect the banks from claims when one joint account owner withdraws funds from the joint account. It does not, in and of itself, determine ownership interests in the disputed funds."

Section 36a-290, the section of our banking statutes that governs joint deposit and share accounts, "provides that, when an account is created in the names of two or more people, such account is deemed a joint account, and any part or all of the balance of such account, including any and all subsequent deposits or additions made thereto, may be paid to any of such persons during the lifetime of all of them . . . . Thus, under this statute, a bank is authorized to release up to the entire balance of a joint account to each and any coholder who so demands. . . . [T]his authorization not only provides protection for payor banks but also recognizes a sufficient property interest in each coholder to warrant characterizing all such deposits as a debt due to each coholder sufficient to trigger a third party creditor's statutory right to execute against the entire balance of the joint account." (Citation omitted; internal quotation marks omitted.) *Fleet Bank Connecticut, N.A.* v. *Carillo*, 240 Conn. 343, 349–50, 691 A.2d 1068 (1997). In *Durso* v. *Vessichio*, 79 Conn. App. 112, 828 A.2d 1280 (2003), however, this court held that "§ 36a-290 (a) recognizes the account holder's right to the moneys as a debt due by the bank. *It does not recognize an account holder's rights to the moneys as between holders.*" (Emphasis added.) Id., 117; see also *Grodzicki* v. *Grodzicki*, 154 Conn. 456, 463, 226 A.2d 656 (1967)

("language of [General Statutes § 36-3, the predecessor of § 36a-290] does not determine the respective rights of the parties inter vivos").

Upon a search of Connecticut law, we are unable to find any case law that further expounds on the issue of the legal rights to funds between joint account holders. Therefore, the question of the defendant's actual ownership right to funds as a joint account holder is a question of fact. Here, the question as to whether the defendant had the ownership right to remove the money from the accounts or if it was an intentional wrongful appropriation of the funds was an issue for the jury to decide. Accordingly, we conclude that the court's instructions did not mislead the jury, and, thus, this claim fails under the third prong of *Golding*.

III

Finally, the defendant claims that § 53a-123 (a) (5) is unconstitutionally vague as applied in this case. Specifically, the defendant argues that she was charged with embezzlement from the estate, and not the person, of Matlis, and that § 53a-123 (a) (5) does not contemplate the charge of embezzlement against an estate. The defendant again failed to raise this claim at trial and seeks to prevail pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40. We will review his claim under *Golding* because the record is adequate for review and a claim that a statute is unconstitutionally vague implicates the defendant's fundamental due process right to fair warning. See *State* v. *Coleman*, 83 Conn. App. 672, 676–77, 851 A.2d 329, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004), cert. denied, 544 U.S. 1050, 125 S. Ct. 2290, 161 L. Ed. 2d 1091 (2005). We conclude, however, that there was no constitutional violation because the statute is not vague as applied to the circumstances of the present case.

We begin by setting forth the relevant legal principles. "The void for vagueness doctrine is a procedural due process concept that originally was derived from the guarantees of due process contained in the fifth and fourteenth amendments to the United States constitution. . . . The constitutional injunction that is commonly referred to as the void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . For statutes that do not implicate the especially sensitive concerns embodied in the first amendment, we determine the constitutionality of a statute under attack for vagueness by considering its applicability to the particular facts at issue. . . .

"In challenging the constitutionality of a statute, the defendant bears a heavy burden. To prevail on his vagueness claim, [t]he defendant must demonstrate beyond a reasonable doubt that the statute, as applied to him, deprived him of adequate notice of what conduct the statute proscribed or that he fell victim to arbitrary and discriminatory enforcement. . . . The proper test for determining [whether] a statute is vague as applied is whether a reasonable person would have anticipated that the statute would apply to his or her particular conduct. . . . The test is objectively applied to the actor's conduct and judged by a reasonable person's reading of the statute . . . .

"If the language of a statute fails to provide definite notice of prohibited conduct, fair warning can be provided by prior judicial opinions involving the statute . . . or by an examination of whether a person of ordinary intelligence would reasonably know what acts are

permitted or prohibited by the use of his common sense and ordinary understanding." (Citations omitted; internal quotation marks omitted.) *State* v. *Maurice M.*, 116 Conn. App. 1, 6–7, 975 A.2d 90, cert. granted on other grounds, 293 Conn. 926, 980 A.2d 913 (2009).

Section 53a-123 (a) provides in relevant part: "A person is guilty of larceny in the second degree when he commits larceny, as defined in section 53a-119, and . . . (5) the property, regardless of its nature or value, is obtained by embezzlement, false pretenses or false promise and the victim of such larceny is sixty years of age or older . . . ." The defendant claims that because "[a] probate estate is not a person over the age of sixty," she cannot be convicted under this statute. Because it is not the form in which the property is held, but to whom it belongs that is determinative, we find no merit to this claim.

A conservator of the estate is defined as "a person . . . appointed by the Court of Probate under the provisions of sections 45a-644 to 45a-663, inclusive, to supervise the financial affairs of a person found to be incapable of managing his or her own affairs . . . and includes a temporary conservator of the estate appointed under the provisions of section 45a-654." General Statutes § 45a-644 (a). The purpose of a conservatorship is to "ensure that the legal disability imposed will not undermine adequate protection of a ward's interest." *Cottrell* v. *Connecticut Bank & Trust Co.*, 175 Conn. 257, 264, 398 A.2d 307 (1978). Thus, because a conservatorship estate is formed for the purpose of protecting the assets of a person who is incapable of managing his or her financial affairs, it follows that § 53a-123 (a) (5) prohibits embezzlement from an estate of a person sixty years of age or older. We conclude that the statutory language afforded the defendant sufficient notice that § 53a-123 (a) (5) applies to conduct that occurred after a conservator had been appointed for

the estate of Matlis. Accordingly, we conclude that this claim fails under the third prong of *Golding.*

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.