******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

STATE OF CONNECTICUT *v.* JODI M. DOJNIA
(AC 40650)

Sheldon, Keller and Flynn, Js.*

*Syllabus*

Convicted of the crime of assault of a disabled person in the second degree in violation of statute (§ 53a-60b [a] [1]), the defendant appealed to this court, claiming, inter alia, that § 53a-60b (a) (1) was unconstitutionally vague as applied to her conduct to the extent that it relied on the statutory (§ 1-1f [b]) definition of physically disabled. The defendant alleged that § 1-1f (b) was impermissibly broad and did not provide sufficient guidance with respect to whether the victim was physically disabled. The defendant and the victim, her sister, had engaged in a physical altercation in which the defendant struck the victim with a wooden billy club. The victim, at the time of the encounter, suffered from fibromyalgia, a nerve condition for which she had been receiving ongoing medical treatment and was taking prescription medications. She also experienced chronic pain issues and physical limitations that made sitting, standing and walking difficult. *Held*:

1. The defendant could not prevail on her unpreserved claim that § 53a-60b (a) (1) was unconstitutionally vague as applied to her violent conduct toward the victim: the defendant failed to demonstrate that a constitutional violation occurred that deprived her of a fair trial, as a reasonable person of ordinary intelligence would have anticipated that a plain reading of § 53a-60b (a) (1) would apply to her conduct, which clearly came within the statute's unmistakable core of prohibited conduct, and the record reflected that the victim was physically disabled for purposes of § 53a-60b (a) (1) because she suffered from a chronic bodily condition that significantly hampered her ability to carry out many of the everyday activities of life, and for years prior to the events at issue had received medical treatment and prescriptions to alleviate her pain and to help her sleep; moreover, the term physical disability as used in § 1-1f (b) had a readily ascertainable meaning that referred to any recurring bodily condition that detrimentally affected one's ability to carry out life's activities, and the phrase in § 1-1f (b), "not limited to," reflected that the legislature did not intend to list in § 1-1f (b) every bodily condition that could result in a physical disability and did not necessitate a conclusion that § 1-1f (b) lacked sufficient guidance with respect to its meaning, as the language at issue was general enough to encompass a wide variety of physical conditions, yet specific enough to provide sufficient notice as to the types of bodily conditions that are encompassed by the term physical disability.

2. The evidence was sufficient to support a finding that the victim suffered from a physical disability for purposes of § 53a-60b (a) (1): evidence of the victim's lengthy medical history, and the testimony of the victim and L, a physician assistant who had treated her for several years, amply supported a finding beyond a reasonable doubt that the victim had a diagnosis of fibromyalgia at the time of the assault, there was no support for the defendant's claim that the state bore the burden of proving beyond a reasonable doubt that the victim's physical disability was caused by any particular illness or injury, that the diagnosis was medically accurate or that her alleged physical disability for purposes of § 1-1f (b) was the result of fibromyalgia, and the defendant's claim that a diagnosis of fibromyalgia did not satisfy the physical disability requirement of § 53a-60b (a) (1) was unavailing, as the evidence of the victim's physical disability was not limited to a diagnosis of fibromyalgia, and the victim and L testified that she had a complex medical history, and that L had prescribed medications and provided a variety of treatments for chronic pain issues and fibromyalgia syndrome; moreover, the defendant's assertions that § 1-1f (b) was ambiguous as to whether fibromyalgia constituted a physical disability, which was based on her claim that § 1-1f (b) required that a disability be established through conclusive medical tests and be more uniform in its symptoms, severity and presentation than fibromyalgia, would graft onto § 1-1f (b) limitations that are

not evident in it as it is written, and the exclusion from the definition of physical disability of a chronic and painful physical condition that significantly hinders a person's ability to carry out several everyday life activities would thwart the broad protective purpose reflected in the plain language of § 1-1f (b).

3. The defendant could not prevail on her claim that she was deprived of her right to a fair trial as a result of certain comments of the prosecutor during closing argument to the jury about a 911 call that the defendant had made after the altercation with the victim: the prosecutor's reference to what the defendant said or almost said in the 911 call was fair commentary and reasonably could be interpreted to suggest that the defendant almost said that she let the victim have it, and the inference that the prosecutor drew was not the result of speculation, as the defendant's statement to the 911 dispatcher about the manner in which the altercation began reasonably could be interpreted to reflect that the defendant changed her explanation mid-sentence to provide a less incriminatory explanation; moreover, the prosecutor's remark was based on the content of the 911 recording, which was a full exhibit at trial and was played in the jury's presence, the argument was consistent with the defendant's testimony and theory of defense, the context of the prosecutor's argument suggested that the jury was being asked to draw inferences from the 911 recording, and it was not likely that the jury would have interpreted the prosecutor's isolated remark about what the defendant said to be anything other than the prosecutor's suggested interpretation of the 911 recording.

Argued January 7—officially released June 4, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of assault of a disabled person in the second degree, assault in the third degree and reckless endangerment in the second degree, brought to the Superior Court in the judicial district of Waterbury, geographical area number four, and tried to the jury before *Cremins*, *J.*; verdict of guilty of assault of a disabled person in the second degree and reckless endangerment in the second degree; thereafter, the court vacated the verdict as to the charge of reckless endangerment in the second degree; judgment of guilty of assault of a disabled person in the second degree, from which the defendant appealed to this court. *Affirmed*.

*Megan L. Wade*, assigned counsel, with whom were *James P. Sexton*, assigned counsel, and, on the brief, *Emily Graner Sexton*, assigned counsel, for the appellant (defendant).

*Brett R. Aiello*, special deputy assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Karen Diebolt*, former assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Jodi M. Dojnia, appeals from the judgment of conviction, rendered following a jury trial, of assault of a disabled person in the second degree in violation of General Statutes § 53a-60b (a) (1).[1] The defendant claims that (1) § 53a-60b (a) (1) is unconstitutionally vague as applied to her conduct, (2) the evidence did not support a finding that the victim[2] was physically disabled, and (3) prosecutorial impropriety during closing argument deprived her of a fair trial. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In October, 2015, the defendant and the victim, who are sisters, resided in separate units of a duplex style home in Naugatuck that was owned by their mother. For years prior to the events at issue, the victim suffered from chronic pain and was physically limited in performing everyday tasks, such as standing, walking, and climbing stairs.

For several years prior to the events at issue, the defendant and the victim did not have a good relationship. The relationship between the defendant and the victim worsened in January, 2015, when the defendant's son, who resided with the defendant, was involved in an altercation with the victim at her residence. According to the victim, during this prior incident, the defendant's son broke down her back door and attacked her, which led to his arrest. Tensions escalated further because the defendant was unhappy with the fact that the victim's dog entered her portion of their shared backyard, and that the victim failed to clean up after her dog. Shortly before the incident underlying this appeal, the defendant erected a small plastic fence to separate her backyard from that of the victim in an attempt to keep the victim's dog away. The fence ran across the backyard and between the two rear doors of the residence. The victim was unhappy about the fence. The victim's mother had asked the victim to look for another place to live and, by October, 2015, the victim was actively planning to move out of her residence.

Late in the evening on October 10, 2015, the victim walked out of the front door of her residence. From one of the windows of the defendant's residence, the defendant made a negative comment to the victim, who was talking on her cell phone, but the victim declined to engage the defendant in conversation. At approximately 1:30 a.m., on October 11, 2015, the victim left her residence to walk her dog by means of her back door, which was adjacent to the back door leading into the defendant's residence. By this point in time, the victim had consumed multiple alcoholic beverages. The victim walked her dog in the vicinity of her nearby driveway.

While the victim was reentering her residence with her dog, she noticed that a light had been turned on inside of the defendant's residence. The victim then stepped back outside, at which time the defendant, who was lurking near the victim's back door, grabbed the victim by the upper part of her body and pulled her over the small plastic fence that was separating their backyards, causing the victim to topple to the ground. A physical struggle between the defendant and the victim ensued, during which the defendant struck the victim repeatedly with a wooden billy club. The victim, while lying on the ground, tried to prevent the defendant from continuing to strike her. The victim grabbed the defendant's hand and pulled her by her hair, causing her to fall on top of her. The victim repeatedly told the defendant to "[l]et go" of the billy club, and the defendant told the victim that she was tired of her, that she hated her, and that she wanted her "out of here."

Ultimately, the victim restrained the defendant, and the victim asked her what their father, who had died, would say to them if he saw them fighting. The defendant promised not to strike the victim again, at which time the victim released her grasp on the defendant's hair and the defendant stepped away from the victim.

The defendant picked up the victim's cell phone, which had fallen out of the victim's hands during the altercation, and gave it back to her. The victim tossed aside one of the defendant's garbage pails before making her way back inside. The victim was bleeding from her nose and choking on blood. The victim sustained multiple bruises and lacerations on her face, back, left arm, left shoulder, left leg, and torso. The victim's right eye swelled and she experienced a great deal of pain, particularly pain that emanated from her jaw. The victim's clothing was stained with blood and dirt, and she was unable immediately to locate either her eyeglasses or a pendant that she had been wearing prior to the altercation.

After the victim went back inside of her residence, she called the police. Soon thereafter, Naugatuck police Officer Robert Byrne arrived on the scene. He encountered the defendant and the victim arguing in front of the residence. After he separated the sisters, he met privately with the defendant. The defendant admitted that she had struck the victim with the wooden billy club, which was on her kitchen table, but stated that she had acted in self-defense. The defendant also stated that she had begun arguing with the victim after she caught the victim "snooping around in the backyard . . . ." She stated that the small plastic fence that she had erected to prevent the victim's dog from entering her portion of the backyard was a cause of consternation between her and the victim. The defendant sustained injuries during the incident and claimed to have been "strangled" by the victim, but her injuries were

not serious enough to warrant medical treatment. Byrne arrested the defendant on the assault charge, took her into custody, and transported her to police headquarters to complete the booking process.

Naugatuck police Officer Shane Andrew Pucci arrived on the scene to provide Byrne with backup assistance. He spoke with the victim privately in her residence and accompanied her to a hospital after emergency medical services had arrived on the scene. At the hospital, medical personnel took X-ray images of the victim and treated her injuries. While at the hospital, the victim provided Byrne with an oral statement concerning the incident and her injuries. By 6 a.m. on October 11, 2015, the victim was discharged from the hospital and transported home. Pucci gave the victim a misdemeanor summons for disorderly conduct. Additional facts will be set forth as necessary in the context of the claims raised on appeal.

I

First, we address the defendant's claim that § 53a-60b (a) (1) is unconstitutionally vague as applied to her conduct.[3] We disagree.

In a substitute information dated February 17, 2017, the state charged the defendant with violating § 53a-60b (a) (1) "in the town of Naugatuck . . . on or about the 11th day of October, 2015, [in that the defendant] recklessly caused serious physical injury to a disabled person: to wit: [the victim] by means of a deadly weapon, by hitting her with a billy club."

Section 53a-60b (a) provides in relevant part: "A person is guilty of assault of an elderly, blind, disabled or pregnant person or a person with intellectual disability in the second degree when such person commits assault in the second degree under section 53a-60 or larceny in the second degree under section 53a-123 (a) (3) and (1) the victim of such assault or larceny has attained at least sixty years of age, is blind or physically disabled, as defined in section 1-1f, or is pregnant . . . ." As is reflected in the state's substitute information, the state's theory of the case was that the defendant engaged in conduct constituting assault in the second degree as defined by General Statutes § 53a-60 (a) (3) against the victim, who is physically disabled as defined by General Statutes § 1-1f (b). Section 53a-60 (a) provides: "A person is guilty of assault in the second degree when . . . (3) the actor recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument . . . ." Section 1-1f (b) provides: "An individual is physically disabled if he has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial

appliance or device."

Relying on the protections afforded to her by the fifth and fourteenth amendments to the federal constitution, the defendant argues that § 53a-60b (a) (1) is impermissibly vague because it expressly relies on the definition of "physically disabled" that is codified in § 1-1f (b). The defendant argues that § 1-1f sets forth a definition of "physically disabled" that is impermissibly broad and that is unclear to the average person. According to the defendant, because § 53a-60b (a) (1) fails to define the offense with sufficient definiteness, the statute was susceptible of being applied in an arbitrary and discriminatory manner against her in the present case. The defendant argues: "Specifically, it allowed [for] a conviction of assault in the second degree of a disabled person where the state introduced minimal evidence that the victim suffered from fibromyalgia, a poorly understood and oftentimes misdiagnosed syndrome. . . . Put another way, the statute was arbitrarily enforced because it is so unclear that ordinary people cannot understand what specifically constitutes 'physically disabled,' thereby allowing the state to rely on [the statute] inconsistently and on an ad hoc basis."

The defendant clarifies that she does not claim that § 53a-60b (a) (1) is vague on its face, such that she lacked notice of the conduct prohibited by the statute. Rather, the defendant argues, § 53a-60b (a) (1) and § 1-1f are "unconstitutionally vague in application because the legislature, by incorporating § 1-1f into the criminal offense . . . impermissibly delegated basic policy matters to the courts for resolution of whether a diagnosis of fibromyalgia falls within the definition of 'physically disabled' for resolution on an ad hoc basis. In so doing, the enforcement of these statutes in the defendant's case [was] arbitrary." (Footnote omitted.) In arguing that the statute was applied arbitrarily to her, the defendant relies on the fact that she "did not assault a victim in a wheelchair, a victim with an amputation, nor a victim with a type of visible, clearly diagnosable illness, disease, or impairment." Instead, the defendant argues, "she got into a fight with her sister, who has been diagnosed with fibromyalgia . . . a poorly defined medical condition about which the medical community remains divided as to its existence."

The defendant seeks review of this unpreserved claim under the bypass doctrine set forth in *Golding*, under which "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the

alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).

The record is adequate to review the claim because the record reflects the conduct that formed the basis of the defendant's conviction under § 53a-60b (a) (1). See, e.g., *State* v. *Indrisano*, 228 Conn. 795, 800, 640 A.2d 986 (1994) (discussing requirements for reviewability). Additionally, we conclude that because a claim that a statute is vague as applied to a defendant implicates the constitutional guarantee of due process that is enshrined in the fourteenth amendment to the United States constitution; see, e.g., *State* v. *Pettigrew*, 124 Conn. App. 9, 24–25, 3 A.3d 148, cert. denied, 299 Conn. 916, 10 A.3d 1052 (2010); the claim is of constitutional magnitude. Having determined that the claim is reviewable under *Golding*, we turn to its merits.

"The determination of whether a statutory provision is unconstitutionally vague is a question of law over which we exercise de novo review. . . . In undertaking such review, we are mindful that [a] statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to him, the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . .

"The United States Supreme Court has set forth standards for evaluating vagueness. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. . . . [A] law forbidding or requiring conduct

in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law. . . .

"Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications. . . . Therefore, a legislature [must] establish minimal guidelines to govern law enforcement. . . .

"Tempering the foregoing considerations is the acknowledgment that many statutes proscribing criminal offenses necessarily cannot be drafted with the utmost precision and still effectively reach the targeted behaviors. Consistent with that acknowledgment, the United States Supreme Court has explained: The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited. *Colten* v. *Kentucky*, 407 U.S. 104, 110, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972) . . . . Simply put, [w]hile some ambiguous statutes are the result of poor draftsmanship, it is apparent that in many instances the uncertainty is merely attributable to a desire not to nullify the purpose of the legislation by the use of specific terms which would afford loopholes through which many could escape." (Citations omitted; internal quotation marks omitted.) *State* v. *Winot*, 294 Conn. 753, 758–61, 988 A.2d 188 (2010).

"A statute . . . [that] forbids or requires conduct in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. . . . Laws must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly. . . . Unless a vagueness claim implicates the first amendment right to free speech, [a] defendant whose conduct clearly comes within a statute's unmistakable core of prohibited conduct may not challenge the statute because it is vague as applied to some hypothetical situation . . . . In contrast, [i]n a facial vagueness challenge, we . . . examine the challenged statute to see if it is impermissibly vague in all of its applications. A statute that is impermissibly vague in all its applications is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. . . . Such a provision simply has no core." (Citations omitted;

emphasis omitted; internal quotation marks omitted.) *State* v. *Josephs*, 328 Conn. 21, 31–32, 176 A.3d 542 (2018). "The proper test for determining [whether] a statute is vague as applied is whether a reasonable person would have anticipated that the statute would apply to his or her particular conduct. . . . The test is objectively applied to the actor's conduct and judged by a reasonable person's reading of the statute . . . .

"If the language of a statute fails to provide definite notice of prohibited conduct, fair warning can be provided by prior judicial opinions involving the statute . . . or by an examination of whether a person of ordinary intelligence would reasonably know what acts are permitted or prohibited by the use of his common sense and ordinary understanding." (Internal quotation marks omitted.) *State* v. *Lavigne*, 121 Conn. App. 190, 205–206, 995 A.2d 94 (2010), aff'd, 307 Conn. 592, 57 A.3d 332 (2012).

As is reflected in the general recitation of facts, there was evidence to support a finding that, on October 11, 2015, the defendant grabbed the victim by the upper body, pulled her over the small plastic fence that separated her backyard from the victim's backyard, and struck her repeatedly with a wooden billy club until the victim restrained the defendant and stopped the attack.

At trial, the victim testified about her extensive medical history. She testified that she had experienced back problems since 2000 and had undergone two surgical procedures on her back. She testified that she had undergone multiple "foot surgeries" in 1990, "five or six ear surgeries" in 2000, and "one breast surgery." Also, the victim testified that she had suffered from a nerve condition called fibromyalgia, for which she receives ongoing medical treatment. She testified that, at the time that the assault occurred, she was using a variety of medications that had been prescribed for her. Specifically, she was using a medication called Savella to treat her fibromyalgia, three times per day. She was using a medication called Vicodin to treat her pain, usually once per day. She explained: "Depending on the day, if . . . I know I'm not going to be doing much that day, I'll probably just take one [Vicodin] in the morning or when I wake up." She also testified that she used Ambien, which helped her to sleep, as needed. The victim testified that she had experienced physical limitations for many years: "I can't sit too long. I can't stand too long. Walking a far distance is difficult for me. Stairs are very difficult for me to do if I'm carrying something. Just grocery shopping, doing laundry, it's a task for me to do those things."

The victim testified that she had received treatment from her primary care physician as well as from Matthew Letko, whom she described as being an employee of "[the] arthritis center." The victim testified that she had received social security disability payments since

2004, and that in the ten years prior to her testimony in 2017, she had not had been engaged in any employment to supplement her disability income.

The state presented testimony from Letko, who explained that he was a physician's assistant employed by the Arthritis Center of Connecticut, in Waterbury.[4] Letko testified that the victim had been a patient of the center since February, 2008, and that he had been treating her since 2009 for "chronic pain issues, chronic low back pain and fibromyalgia syndrome." He testified that fibromyalgia is "a widespread pain syndrome primarily affecting muscles, upper back, mid-back, low back, hips, shoulders. It presents with a lot of tenderness, sensitivity to touch. There can also be other symptoms associated like fatigue, poor sleep." Letko testified that the treatment that he provided to the victim included prescribing "Savella, which is a medication specifically approved for fibromyalgia syndrome, muscle relaxants, anti-inflammatory medications; other treatments also include injections, physical therapy, [and] aquatic therapy." He testified that, in October, 2015, the victim was prescribed Savella, Ambien and Vicodin. Letko testified that he evaluated the victim on a monthly basis. He stated that the physical limitations related to her chronic back pain and fibromyalgia included difficulty in prolonged sitting, hearing, bending, lifting, and using stairs. Letko testified that although her pain symptoms may fluctuate from day to day, her condition was not going to improve. He testified that the goal of his treatment plan for the victim "would be to manage the pain effectively enough where she can have a quality of life where she can function around the home, in the community . . . take care of herself, get out of bed every morning, perform basic tasks around the house."

The defendant argues that to the extent that § 53a-60b (a) (1) relies on § 1-1f (b) to define "physically disabled," it lacks sufficient definiteness in that it fails to apprise ordinary persons of the meaning of "physically disabled" and, thus, it does not provide sufficient guidance with respect to whether the victim was physically disabled. Although we do not have the benefit of a prior judicial interpretation of "physically disabled," its meaning is ascertainable by affording the language of § 1-1f (b) its plain meaning. "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case . . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning . . . [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering

such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . Issues of statutory construction raise questions of law, over which we exercise plenary review." (Citation omitted; internal quotation marks omitted.) *State* v. *Griffin*, 184 Conn. App. 595, 617–18, 195 A.3d 723, cert. denied, 330 Conn. 941, 195 A.3d 692, 693 (2018).

As we have set forth previously, § 1-1f provides: "An individual is physically disabled if he has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device." It is well settled that courts may rely on dictionaries when ascertaining the commonly approved usage of words and phrases found in statutes. See, e.g., *Princess Q. H.* v. *Robert H.*, 150 Conn. App. 105, 115, 89 A.3d 896 (2014). "Chronic" is defined in relevant part as "marked by long duration or frequent recurrence: not acute . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2012) p. 221. "Physical" is defined in relevant part as "of or relating to the body . . . ." Id., p. 935. "Handicap" is defined in relevant part as "a disadvantage that makes achievement unusually difficult . . . ." Id., p. 565. "Infirm" is defined in relevant part as "of poor or deteriorated vitality . . . feeble from age . . . not solid or stable . . . ." Id., p. 640. "Impair" is defined as "to damage or make worse by or as if by diminishing in some material respect . . . ." Id., p. 622.

Contrary to the ambiguity suggested by the defendant, the term "physical disability," as used in § 1-1f (b), has a readily ascertainable meaning. It refers to *any* recurring bodily condition that detrimentally affects one's ability to carry out life's activities, regardless of whether it is congenital, the result of bodily injury, organic processes, or the result of illness. The language used in the statute, particularly the phrase, "not limited to," reflects that the legislature did not intend to set forth an exhaustive list of each and every bodily condition that could result in a physical disability, and the fact that the legislature did not do so does not necessitate a conclusion that the statute lacks sufficient guidance with respect to its meaning. See, e.g., *State* v. *Winot*, supra, 294 Conn. 760–61 (lack of specificity not necessarily result of imprecise drafting but desire not to create loopholes in statute). Here, the language at issue is general enough to encompass a wide variety of physical conditions, yet specific enough to provide sufficient notice as to its meaning and, specifically, as to the types of bodily conditions encompassed by the term "physical disability."

We conclude that the defendant's violent conduct in the present case clearly came within the unmistakable core of conduct prohibited by § 53a-60b (a) (1). The record reflects that the victim was physically disabled for purposes of § 53a-60b (a) (1) because she suffered from a chronic bodily condition that significantly hampered her ability to carry out many of the everyday activities of life. The record reflects that the victim's physical condition, which caused her pain, disadvantaged her, and that, for years prior to the events at issue, the victim had received medical treatment to treat that condition, which included prescriptions to alleviate her pain and to help her sleep.[5] A plain reading of § 53a-60b (a) (1) and the facts in evidence strongly persuade us to conclude that a reasonable person of ordinary intelligence would have anticipated that the statute would apply to the defendant's violent conduct toward the specific victim in the present case.[6]

In light of the foregoing, we disagree with the defendant that the statute lacked minimal guidelines or sufficient standards to guide law enforcement with respect to its proper application. Accordingly, we conclude that the defendant's claim fails under *Golding*'s third prong because she has failed to demonstrate that a constitutional violation occurred that deprived her of a fair trial.

## II

Next, the defendant claims that the evidence did not support a finding that the victim was physically disabled for purposes of § 53a-60b (a) (1).[7] This claim consists of two closely related subclaims that we will analyze separately. First, the defendant claims that the evidence was insufficient to demonstrate that the victim "had a diagnosis of fibromyalgia." Second, the defendant claims that, if the evidence supported a finding that the victim had been diagnosed with fibromyalgia, "[a] diagnosis of fibromyalgia does not satisfy the physical disability requirement of § 53a-60b (a) (1)." We disagree.

We begin by setting forth the familiar standard of review for claims of evidentiary insufficiency in a criminal appeal. "The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those

conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [finder of fact] to conclude that a basic fact or an inferred fact is true, the [finder of fact] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Calabrese*, 279 Conn. 393, 402–403, 902 A.2d 1044 (2006).

We also clarify the essential elements of the offense that are the subject of the defendant's claim. To obtain a conviction under § 53a-60b (a) (1), the state bore the burden of proving beyond a reasonable doubt that (1) the defendant committed assault in the second degree pursuant to § 53a-60 and (2) the victim of the assault was physically disabled pursuant to § 1-1f (b). The defendant does not challenge the sufficiency of the evidence with respect to the first element. The defendant challenges only the second essential element of the offense, which requires proof beyond a reasonable doubt that the victim of the assault "has any chronic physical handicap, infirmity or impairment, whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device." General Statutes § 1-1f (b). To the extent that the defendant's claim requires us to interpret § 1-1f (b), we rely on the interpretation of the statute set forth in part I of this opinion.

A

The defendant claims that the evidence was insufficient to sustain the conviction because the state failed to prove beyond a reasonable doubt that the victim "had a diagnosis of fibromyalgia." The defendant argues in relevant part: "Because fibromyalgia is a poorly defined illness with no clear understanding of its pathology within the medical community, the state cannot, as a matter of law, prove beyond a reasonable doubt that someone has fibromyalgia." The defendant also argues: "The dearth of evidence produced by the state

as to how exactly Letko and his supervising physician came to a diagnosis and the severity of [the victim's] specific case of fibromyalgia supports a conclusion that the evidence was insufficient for the jury reasonably to conclude beyond a reasonable doubt that [the victim] suffered from a disabling case of fibromyalgia. . . .

"Letko's testimony focused on fibromyalgia, in general, and how he treated [the victim] based on a diagnosis of fibromyalgia. The state did not introduce any evidence as to Letko's methodology for arriving at [the victim's] diagnosis, or testing specific to [the victim] that he conducted to rule out other potential causes of her symptoms. . . . Nor did the state introduce any of [the victim's] medical records to support a diagnosis. Because no exclusive test exists to demonstrate that a patient suffers from fibromyalgia . . . it is important for the evidence to support a conclusion that the diagnosis is correct." (Citations omitted.)

In part I of this opinion, we discussed the evidence presented by the state with respect to the victim's physical disability. We reiterate that this evidence was in the form of testimony from the victim and Letko, the physician's assistant who treated her for many years. Letko testified in relevant part that he had treated the victim for "[v]arious chronic pain issues, chronic low back pain, and fibromyalgia syndrome." He discussed the various forms of therapy that he used on the victim, including "a medication specifically approved for fibromyalgia syndrome, muscle relaxants, anti-inflammatory medications . . . injections, physical therapy, [and] aquatic therapy." Letko testified that the victim was prescribed medication to treat fibromyalgia, medication to help her sleep, and medicine to alleviate pain. Although the victim and Letko testified that the victim suffered from fibromyalgia, neither the victim nor Letko attributed her chronic physical condition solely to fibromyalgia. To the contrary, Letko testified that the victim's "chronic back pain and fibromyalgia syndrome" caused the victim to experience pain and to have limitations with respect to activities including sitting, hearing, bending, lifting and going up and down stairs. Letko testified that his goal in treating the victim is to manage her pain so that she can "get out of bed every morning [and] perform basic tasks around the house."[8]

The defendant couches her claim in terms of whether the victim "had a diagnosis of fibromyalgia" at the time of the assault. Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the testimony of both the victim and Letko demonstrated that the victim had such a diagnosis. The substance of the defendant's arguments, however, reflects the defendant's apparent belief that the state bore the burden of proving beyond a reasonable doubt that the diagnosis was medically accurate and that the victim's alleged physical disability for purposes of § 1-1f (b) was

the result of fibromyalgia.

As our discussion of the elements of the offense reflects, the state did not bear the burden of demonstrating beyond a reasonable doubt that the victim had been diagnosed with fibromyalgia, that she suffered from fibromyalgia, or that her physical disability was the result of fibromyalgia. Moreover, as we have noted in this opinion, in proving that the victim suffered from a chronic physical disability, one that caused the victim pain and difficulty performing life's everyday tasks, the state did not rely solely on evidence that the victim suffered from fibromyalgia. There was evidence of the victim's lengthy medical history and testimony from Letko that the victim's physical disability was attributable to "various chronic pain issues, chronic low back pain, and fibromyalgia syndrome." In any event, there is no support for the proposition that the state bore the burden of proving beyond a reasonable doubt the victim's physical disability was caused by any particular illness or injury. "We are not in the business of writing statutes; that is the province of the legislature. Our role is to interpret statutes as they are written. . . . [We] cannot, by [judicial] construction, read into statutes provisions [that] are not clearly stated." (Internal quotation marks omitted.) *Thomas* v. *Dept. of Developmental Services*, 297 Conn. 391, 412, 999 A.2d 682 (2010). Section 1-1f (b) provides in relevant part that a person is physically disabled if he or she has a chronic physical handicap, infirmity or impairment "whether congenital or resulting from bodily injury, organic processes or changes or from illness, including, but not limited to, epilepsy, deafness or hearing impairment or reliance on a wheelchair or other remedial appliance or device."

On the basis of the foregoing, we conclude that the defendant's claim is not persuasive. The state did not have to prove beyond a reasonable doubt that the victim had received an accurate diagnosis for any particular illness or disease, but that she suffered from a chronic physical disability that resulted from causes including "bodily injury, organic processes or changes or from illness . . . ." General Statutes § 1-1f (b). Here, the testimony of the victim and Letko amply supported a finding beyond a reasonable doubt that the victim was physically disabled at the time the defendant assaulted her.

B

The defendant claims that, even if the evidence supported a finding that the victim had been diagnosed with fibromyalgia, "[a] diagnosis of fibromyalgia does not satisfy the physical disability requirement of § 53a-60b (a) (1)." The defendant argues that § 1-1f is ambiguous with respect to whether fibromyalgia constitutes a physical disability. On the one hand, the defendant argues that fibromyalgia, as defined by Letko, appears to be a chronic physical infirmity that is encompassed

by the statute. On the other hand, the defendant argues that fibromyalgia does not appear to constitute a physical disability because a diagnosis of fibromyalgia cannot "be established through conclusive tests." Relying on materials that were not presented in evidence, the defendant asserts: "Fibromyalgia manifests itself in numerous ways. In addition, the level of severity of symptoms varies widely from patient to patient, and even from day to day for the same patient. Put simply, fibromyalgia is not as uniform in its symptoms, severity, and presentation as some other disabilities that can be more easily quantified. By way of illustration, there are tests to determine the severity of hearing loss and levels of permanent impairment for orthopedic injuries. There is no indication, however, that many patients diagnosed with fibromyalgia have any presentation of a disability that can be qualified in the same way, let alone affect their level of vulnerability and require additional protections in the same way other physical disabilities do."

The defendant's claim is not persuasive for several reasons. The defendant's arguments are limited to fibromyalgia and whether a diagnosis of fibromyalgia, in and of itself, constitutes a physical disability for purposes of § 1-1f. As we observed previously in this opinion, the evidence that the state presented concerning the victim's physical disability was not limited to a diagnosis of fibromyalgia. Both the victim and Letko testified that the victim had a complex medical history and, as Letko observed, over the course of several years, he had prescribed medications and provided a variety of treatments to the victim to treat "[v]arious chronic pain issues, chronic low back pain, and fibromyalgia syndrome."

Additionally, we observe that the defendant urges us to interpret § 1-1f (b) in such a manner that it requires proof of a disability that "[can] be established through conclusive [medical] tests." Stated otherwise, the defendant argues that a physical disability must be more "uniform in its symptoms, severity, and presentation" or at least "more easily quantified" than fibromyalgia. These arguments are readily undermined by the language used in § 1-1f. Simply put, adopting the defendant's interpretation of the statute would graft upon the statute limitations that are not evident in the statute as it is written. The statute, as written, focuses not on the cause of a physical disability, but on whether a person is disabled, and it does not require that a physical disability be obvious or readily verifiable in the manner suggested by the defendant. We reject the defendant's invitation to exclude from the definition of "physical disability" a chronic and painful physical condition that significantly hinders a person's ability to carry out several of the everyday activities of life. To do so would thwart the broad protective purpose reflected in the plain language of § 1-1f (b).

For the foregoing reasons, the defendant has failed to demonstrate that the evidence was insufficient to prove that the victim suffered from a physical disability for purposes of § 53a-60b (a) (1).

III

Last, the defendant claims that prosecutorial impropriety during closing argument deprived her of a fair trial. We disagree.

The relevant facts are as follows. There was evidence that, for many years, the defendant and the victim had a rocky relationship and that, in the days leading up to October 11, 2015, the issue of the victim's dog and the fence erected by the defendant was a cause of disagreement between them. The victim testified that, in the early morning of October 11, 2015, the defendant caught her by surprise and physically assaulted her after she had stepped out of the back door of her residence. The victim testified that the defendant grabbed her by the upper body, pulled her over the small plastic fence that separated their backyards, and struck her with a wooden billy club while she lay helplessly on the ground. The defendant repeatedly told the victim that she hated her and wanted her to leave. The victim testified that, ultimately, she restrained the defendant and let her go after she had promised to stop striking her.

At trial, the defendant testified in relevant part that she was home alone on October 11, 2015. She became startled when her doorbell rang at approximately 1:30 a.m. She armed herself with a wooden billy club for protection and, in an attempt to see who rang her doorbell, she went outside behind her residence. She did not see anything noteworthy and turned to go back inside. At that moment, the victim's back door "goes flying open," and the victim, who smelled of alcohol, angrily motioned to the defendant and stated, "[c[ome on bitch . . . ." The defendant testified that, acting "in a rage," the victim grabbed her by the hair, pulled her to the ground, and wrapped her body so tightly around the defendant's body that she had difficulty breathing. The victim told the defendant, "[d]ie, bitch." The defendant testified that she and the victim "wrestl[ed] around" before the defendant gained control of her billy club and began to swing it "all over the place." The defendant testified that she certainly was not the aggressor, and she could not recall striking the victim. She testified that, after the altercation ended, she went inside and called the police.

During its case-in-chief, and in the absence of an objection by defense counsel, the state introduced into evidence an audio recording of the 911 call that the defendant had made at 1:58 a.m. on October 11, 2015. During the call, the defendant briefly explained what had occurred with her sister, the victim, in relevant

part, as follows: "I went outside to see who was out there because somebody was ringing the fucking doorbell and it was her standing there. She came at me, and I fucking let—and a fight broke out."

During the prosecutor's rebuttal closing argument, she stated in relevant part: "What . . . the judge is going to instruct you also [is] that you can draw reasonable inferences from the evidence. And I'll give you an example of that. So, you can go further with what you have to come to a conclusion of things that we don't know. And it's the state's position that the reasonable inferences that you can draw from the evidence in this case is that . . . the defendant was upset with [the victim] . . . [the defendant] heard [the victim] walk her dog out the back; [the defendant] turned out the outside light and went outside with a billy club in her hand; they had words; *and, she, as she said or almost said in the 911 call, she let [the victim] have it*; she struck [the victim] with the billy club across the nose and eye; [the victim] fell to the ground." (Emphasis added.) The defendant did not object to the prosecutor's argument.

For the first time on appeal,[9] the defendant, relying on the emphasized portion of the prosecutor's rebuttal closing argument set forth in the preceding paragraph, claims that "the prosecutor made improper argument by describing facts not in evidence when she erroneously speculated to the jury how the defendant would have ended a statement that she did not finish during the [911] call." The defendant argues that the prosecutor's argument constituted an improper reference to "facts not in evidence" and that it amounted to "pure speculation" as to how the defendant may have completed the statement that she made during the 911 call.

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial . . . ." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 428, 902 A.2d 636 (2006). In evaluating whether prosecutorial impropriety, if proven, amounted to a denial of due process, we consider the factors enumerated by our Supreme Court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due defer-

ence to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . This heightened duty derives from our long recognition of the special role played by the state's attorney in a criminal trial. He is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . .

"Or to put it another way while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. . . . A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows." (Citations omitted; internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 246–47, 833 A.2d 363 (2003). It is beyond question that "a prosecutor may not comment on evidence that is not a part of the record and may not comment unfairly on the evidence in the record." *State* v. *Fauci*, 282 Conn. 23, 49, 917 A.2d 978 (2007).

Turning to the argument at issue in the present claim,

in which the prosecutor referred to what the defendant "said or almost said in the 911 call," we observe initially that the prosecutor's challenged argument cannot reasonably be interpreted as a suggestion by her that she had additional facts concerning the 911 call beyond those that were properly before the jury. The prosecutor's isolated remark was obviously based on the content of the 911 recording, and the entire 911 recording was a full exhibit at trial which was played in the jury's presence. Thus, we are not persuaded that the remark was not based on the evidence and conclude that it was unlikely that the jury would have interpreted the prosecutor's remark as being based on evidence that was known to her, but was not before the jury. See, e.g., *State* v. *Fernandez*, 169 Conn. App. 855, 869, 153 A.23d 53 (2016) ("when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury" [internal quotation marks omitted]).

Second, we observe that the context of the prosecutor's challenged argument unmistakably suggested that she was asking the jury to draw *inferences* from the evidence presented at trial, specifically, the 911 recording. The argument directly followed the prosecutor's statement that the jury was permitted to draw reasonable inferences from the evidence, and the argument was made during what was, in the prosecutor's words, a summation of "the reasonable inferences that you can draw from the evidence *in this case* . . . ." (Emphasis added.) "A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence." (Internal quotation marks omitted.) *State* v. *Fernandez*, supra, 169 Conn. App. 869.

If the prosecutor had incorrectly referred to what the defendant "said" during the 911 call, such an argument would constitute an improper comment on the evidence. Here, however, the prosecutor referred to what the defendant "said or almost said" during the 911 call. The phrasing of the argument suggests that, during the heat of closing argument, the prosecutor recognized that she was not going to merely describe the 911 call, but draw an inference from it. Thus, the phrase suggests that she immediately corrected her reference to what the defendant had "said." "When reviewing the propriety of a prosecutor's statements, we do not scrutinize each individual comment in a vacuum but, rather, review the comments complained of in the context of the entire trial. . . . [And], when a prosecutor's potentially improper remarks are ambiguous, a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Citation omitted; internal quotation marks

omitted.) *State* v. *Felix R.*, 319 Conn. 1, 9, 124 A.3d 871 (2015). In light of the fact that the challenged argument was made in the context of the prosecutor's broader argument concerning the reasonable inferences that could be drawn from the evidence, we are not persuaded that the jury would have interpreted the isolated remark about what the defendant "said" to be anything other than the prosecutor's suggested interpretation of the 911 recording.

Moreover, the prosecutor's argument that the 911 recording reasonably could be interpreted to suggest that the defendant "almost said" during the 911 call that she "let [the victim] have it" is a fair commentary on the 911 recording. It was not in dispute that the 911 call was made in the minutes following the altercation between the defendant and the victim. Although they differed with respect to the manner in which the altercation began, both the defendant and the victim testified that it was a startling and violent physical struggle. In the 911 call, the defendant did, in fact, state that, after she went outside, she found the victim standing there, and that "[the victim] came at me, and I fucking let— and a fight broke out."

The inference drawn by the prosecutor concerning the way that the defendant "almost" described the altercation during the 911 call was not the product of sheer speculation. The defendant's statement to the 911 dispatcher concerning the manner in which the altercation began reasonably could be interpreted to reflect that the defendant began to explain what *she had done* to the victim, but that she changed her explanation midsentence to provide a less incriminatory explanation by stating "*a fight broke out.*" Moreover, the prosecutor's argument with respect to what the defendant "almost said" during the 911 call was consistent with the defendant's theory of defense and the defendant's trial testimony. The defendant relied on the theory of self-defense, and the defendant's testimony was that she had frantically brandished the billy club during the altercation to defend herself from the victim, who had been the initial aggressor and had held on to her so tightly that she experienced difficulty breathing. The victim testified that the defendant had repeatedly struck her with the billy club, and the evidence of her multiple physical injuries supported a finding that the defendant, in fact, had inflicted physical injuries. In describing the course of events, the inference that the prosecutor asked the jury to draw accurately reflected the defendant's own testimony, in line with her theory of the case, that after the victim came at her, she started "swinging [the billy club] anywhere" to defend herself. And, we observe, even if the requested inference was drawn by the jury, it would not necessarily have proven that the defendant had initiated the fight. Thus, the prosecutor's characterization of the 911 recording was a fair commentary on the evidence.

In light of our conclusion that the defendant has not demonstrated that prosecutorial impropriety occurred, she is unable to demonstrate that the challenged argument deprived her of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] In addition to charging the defendant with assault of a disabled person in the second degree in violation of § 53a-60b (a) (1), the state charged the defendant with assault in the third degree in violation of General Statutes § 53a-61 (a) (1) and reckless endangerment in the second degree in violation of General Statutes § 53a-64. The jury found the defendant guilty of both assault of a disabled person in the second degree and reckless endangerment in the second degree. The jury found the defendant not guilty of assault in the third degree. At the time of sentencing, and at the state's request, the court vacated the jury's verdict of guilty of reckless endangerment in the second degree in accordance with the rationale set forth in *State* v. *Polanco*, 308 Conn. 242, 260, 61 A.3d 1084 (2013) ("when a defendant is convicted of greater and lesser included offenses, the trial court shall vacate the conviction for the lesser offense rather than merging it with the conviction for the greater offense"). The court sentenced the defendant to serve a term of incarceration of five years, execution suspended after she completed a two year mandatory minimum sentence, followed by a term of probation of three years.

[2] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[3] Unlike the defendant, we address her vagueness claim before addressing her sufficiency of the evidence claim because "the gist of a vagueness claim . . . is that due process is violated whenever sufficient evidence of guilt is too readily found by a jury that is left to its own discretion without the guidance of definite enforcement standards." *State* v. *Schriver*, 207 Conn. 456, 458–59 n.3, 542 A.2d 686 (1988).

[4] The court recognized Letko, who testified that he had received training and licensure as a physician's assistant and had practiced under the supervision of a medical doctor, to be "an expert in the area of a physician's assistant."

[5] The defendant attempts to discount the weight of the evidence of disability presented by the state at trial by stating in her principal appellate brief that fibromyalgia is "an illness that even the medical community does not agree exists and believes is both misdiagnosed and overdiagnosed in staggering numbers." Moreover, in an attempt to demonstrate that the statute was unconstitutionally vague as applied to her conduct, the defendant argues that, if the statute is interpreted to encompass a condition such as fibromyalgia, it arguably could apply to an assault committed against the broad class of persons who wear prescription eyeglasses.

The defendant's arguments are not persuasive. First, the evidence does not suggest that the victim's physical disability is solely a consequence of fibromyalgia. The evidence suggests that the victim's physical disability may have resulted from one or more of the physical conditions that she and Letko discussed in their testimony and, in particular, her disability is her chronic pain and her resulting difficulty in carrying out everyday activities. Second, to the extent that the defendant invites us to evaluate whether the statute is vague as applied to persons other than the victim and conditions distinct from those experienced by the victim, which may result in physical disability, we observe that in an evaluation of whether a statute is unconstitutionally vague as applied to a defendant's conduct, we do not focus on whether it is vague as applied to a *hypothetical situation*, but whether it is vague as objectively applied *to the defendant's conduct*. See *State* v. *Josephs*, supra, 328 Conn. 31–32; *State* v. *Lavigne*, supra, 121 Conn. App. 205–206.

[6] Although the statute does not require that a defendant be aware of a victim's physical disability, the defendant testified in relevant part that she was aware that the victim was physically disabled and had discussed the victim's medical conditions with her. The defendant also testified, however, that the victim lied about and exaggerated her medical conditions.

[7] The record reflects that the defendant did not preserve this sufficiency claim for appellate review. The claim is nonetheless reviewable on appeal. See *State* v. *Lewis*, 303 Conn. 760, 767 n.4, 36 A.3d 670 (2012).

[8] Defense counsel cross-examined Letko with respect to the method by which a diagnosis of fibromyalgia is made generally. He testified "there's not one specific test that you can do that clarifies the diagnosis of [fibromyalgia]. There's not a simple blood test or X-ray or [magnetic resonance imaging scan]. It's certain criteria you need to meet. So, earlier, I had mentioned widespread pain; so, there's multiple tender points when you're examining the patient over the body, you know. And, also, you do other tests, so you may want to rule out . . . other medical conditions through X-rays and, basically, like, ruling out those other things and meeting the criteria of those tender points . . . with the associated symptoms of poor sleep, depression, headaches, fatigue that generally meets the criteria . . . to make the diagnosis for fibromyalgia syndrome."

Letko agreed with defense counsel that "all those tests" ruled out other causes for the victim's pain. In relevant part, Letko also testified that a diagnosis of fibromyalgia is largely based on patient complaints and agreed with defense counsel that patients "hypothetically" could fake their complaints. Letko also testified that it was not uncommon for patients to complain of back pain.

[9] Pursuant to *State* v. *Stevenson*, 269 Conn. 563, 572–76, 849 A.2d 626 (2004), the defendant's unpreserved prosecutorial impropriety claim is reviewable on appeal and it is unnecessary for this court to engage in an analysis of the claim under *State* v. *Golding*, supra, 213 Conn. 239–40.

_____