******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

## STATE OF CONNECTICUT *v.* JUAN J. RIVERA
## (AC 42388)

DiPentima, C. J., and Alvord and Keller, Js.*

*Syllabus*

Convicted of the crime of breach of the peace in the second degree, the
    defendant appealed to this court. The defendant was involved in an
    altercation with an instructor at a tractor trailer training school, where
    he was enrolled. The altercation began in the school's student breakroom
    and then continued outside to a parking lot area in front of a garage
    on the premises. The defendant claimed that the evidence was insuffi-
    cient to support a finding that the conduct giving rise to the conviction
    had occurred in a public place, a necessary element of the applicable
    statute (§ 53a-181 (a) (1)). *Held*:

1. The state could not prevail on its argument that the defendant's claim
    on appeal was unreviewable in that the defendant, through counsel,
    explicitly waived his right to have the state prove beyond a reasonable
    doubt that the altercation occurred in a public place under § 53a-181 (a)
    (1) by conceding during closing argument that the altercation occurred
    in a public place, as defense counsel's remarks, whether viewed either
    in isolation or alongside the state's closing arguments and the court's
    jury instructions, did not demonstrate that the defendant intentionally
    relinquished or abandoned his right to have the state prove the public
    place element beyond a reasonable doubt.

2. The evidence was not sufficient to support the defendant's conviction of
    breach of the peace in the second degree, as the cumulative force of
    the state's evidence, when viewed in the light most favorable to sus-
    taining the verdict, was insufficient to establish beyond a reasonable
    doubt that the area in which the altercation occurred was a public place;
    the plain and ordinary meaning of "public" confirmed that the legislature
    intended for § 53a-181 (a) (1) to apply only to conduct that occurs on
    property that is held out for use by all members of the public, not just
    select groups, and, based on the text of the statute, its relationship to
    other statutes, and the plain meaning of the word "public," the meaning
    of the term "public place" in § 53a-181 (a) was plain and unambiguous,
    and the state produced no evidence showing that the area in which the
    altercation occurred was used or held out for use by the public, and
    the jury was left to speculate about the characteristics of the location.

Argued June 17—officially released September 29, 2020

*Procedural History*

Substitute information charging the defendant with
three counts each of the crimes of breach of the peace
in the second degree and threatening in the second
degree, brought to the Superior Court in the judicial
district of Tolland, geographical area number nineteen,
and tried to the court, *Seeley, J.*; thereafter, the court
granted the defendant's motion for judgment of acquit-
tal as to two counts of breach of the peace in the second
degree; verdict and judgment of guilty of one count of
breach of the peace in the second degree, from which
the defendant appealed to this court. *Reversed*; *judg-
ment directed.*

*John L. Cordani, Jr.*, assigned counsel, for the appel-
lant (defendant).

*Denise B. Smoker*, senior assistant state's attorney,
with whom, on the brief, were *Matthew C. Gedansky*,
state's attorney, and *Alison Kubas*, special deputy assis-

tant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, Juan J. Rivera, appeals from the judgment of conviction, rendered following a jury trial, of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (1). The defendant claims that (1) the evidence was insufficient to support a finding that the conduct giving rise to the conviction had occurred in a public place and (2) the conviction violated the constitutional prohibition against double jeopardy. With respect to the first claim, we reverse the judgment of the trial court. Because we conclude that the evidence was insufficient to support the jury's verdict of guilty, and we have reversed the judgment of conviction and ordered that the trial court render a judgment of acquittal, we need not reach the second claim.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. The defendant was enrolled as a student at the New England Tractor Trailer Training School (school) in Somers, where he was training to get his commercial driver's license. On the morning of July 7, 2016, Walter Tarbox, an instructor at the school, entered the school's student breakroom to check in the approximately twenty-five students who were present. The defendant and several other students were seated at a table that Tarbox wanted to use to check students in for the day. When Tarbox asked to use the table, some students moved, but others, including the defendant, remained seated. The defendant stood up and began yelling at Tarbox. The defendant kept "getting into [Tarbox'] face" and was close enough to Tarbox that his nose touched Tarbox' nose. Whenever Tarbox took a step back, the defendant "kept coming forward" toward Tarbox "in a rage." The defendant called Tarbox "the 'N' word" and said that Tarbox needed to "get beat up." He then stated that he wanted to punch Tarbox in the mouth and that he and "his boys" would "come after" Tarbox and Tarbox' family.

The altercation in the breakroom lasted roughly fifteen minutes until the defendant told Tarbox that he wanted to "go outside and fight [Tarbox]." Tarbox reasoned that going outside and away from the other students might diffuse the situation and allow him to locate a lead instructor. The two men walked outside to a parking lot area in front of a garage on the premises. While outside, the defendant continued yelling at Tarbox, calling him "the 'N' word," and saying that he would "bring his boys" and "take care of" him and his family. At times, the defendant pulled his fist back, "squar[ed] up" with Tarbox, and told Tarbox to fight him.

While outside, Tarbox used his cell phone to call Kevin Lusty, a lead instructor at the school, to inform

him about the situation. Tarbox asked Lusty to meet him in front of the garage. After speaking with Tarbox about what happened, Lusty asked the defendant to join him in his supervisor's office to have a private conversation. The two sat down and began speaking about the situation, but Lusty stopped the conversation when, in his words, the defendant "started to disrespect [Tarbox]." The defendant then stood up and slammed his hands on the desk in the office. Immediately after, he said "fuck you" to Lusty and told him not to go outside if, in the defendant's words, he knew what was good for him.

The defendant went back outside and Lusty, concerned for Tarbox, followed him. The defendant, still angry, started coming toward Lusty, but went off to the side of Lusty and then began walking in front of Lusty. The defendant went toward the front of the garage again while yelling about his displeasure with the school. Lusty persuaded the defendant to go into the front of the building and then asked him to leave the premises. The defendant initially refused to leave, but left once Lusty threatened to call the police.

After the incident, Tarbox went home for the day and returned to the school two days later, where he gave a signed, sworn statement to Officer Scott Mazza of the Somers Police Department. After receiving this statement, Mazza and another officer called the defendant. When Mazza asked the defendant about the incident, the defendant raised his voice and became, in Mazza's words, "agitated" and "angry." Mazza then asked the defendant to provide a statement to the police concerning the incident, but the defendant refused and hung up.

Pursuant to an arrest warrant, the police arrested the defendant on March 10, 2017. By substitute information, the state charged the defendant with one count of breach of the peace in the second degree in violation of § 53a-181 (a) (1), one count of breach of the peace in the second degree in violation of § 53a-181 (a) (3), one count of breach of the peace in the second degree in violation of § 53a-181 (a) (5), and three counts of threatening in the second degree in violation of General Statutes (Rev. to 2015) § 53a-62 (a). The defendant pleaded not guilty to all six counts.

A jury trial began on August 24, 2018. The state called Tarbox, Lusty, and Mazza to testify about the incident. The defendant did not call any witnesses and the court did not admit any exhibits from either party into evidence.

At the close of the state's case-in-chief, the defendant moved for a judgment of acquittal on all counts,[1] which the court granted as to the second count, breach of the peace in violation of § 53a-181 (a) (3), and the third count, breach of the peace in violation of § 53a-181 (a)

(5). On August 28, 2018, the jury returned a guilty verdict on count one, breach of the peace in violation of § 53a-181 (a) (1), and found the defendant not guilty of the remaining three counts. The defendant was sentenced to a period of six months incarceration, execution suspended, followed by one year of conditional discharge. This appeal followed.

The defendant claims that the evidence does not support the conviction of breach of the peace in the second degree because it does not support a finding that the conduct giving rise to the conviction, the altercation with Tarbox, had occurred in a public place.[2] We agree.

I

Before turning to the merits of this claim, we must first address the state's argument that it is unreviewable by this court. The state argues that the defendant, through counsel, explicitly waived his right to have the state prove every element of § 53a-181 (a) (1) beyond a reasonable doubt by conceding during closing argument that the altercation occurred in a public place. We disagree with the state's contention.

"[W]aiver is an intentional relinquishment or abandonment of a known right or privilege. . . . It involves the idea of assent, and assent is an act of understanding. . . . The rule is applicable that no one shall be permitted to deny that he intended the natural consequences of his acts and conduct. . . . In order to waive a claim of law it is not necessary . . . that a party be certain of the correctness of the claim and its legal efficacy. It is enough if he knows of the existence of the claim and of its reasonably possible efficacy." (Internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 469, 10 A.3d 942 (2011).

"It is well settled that a criminal defendant may waive rights guaranteed to him under the constitution. . . . The mechanism by which a right may be waived, however, varies according to the right at stake. . . . For certain fundamental rights, the defendant must personally make an informed waiver. . . . For other rights, however, waiver may be effected by action of counsel. . . . When a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal." (Internal quotation marks omitted.) *State* v. *Foster*, 293 Conn. 327, 337, 977 A.2d 199 (2009).

"[A]lthough there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has— and must have—full authority to manage the conduct of the trial. . . . As to many decisions pertaining to the conduct of the trial, the defendant is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney. . . . Thus, decisions by counsel are

generally given effect as to what arguments to pursue . . . what evidentiary objections to raise . . . and what agreements to conclude regarding the admission of evidence . . . . Absent a demonstration of ineffectiveness, counsel's word on such matters is the last." (Internal quotation marks omitted.) *State* v. *Kitchens*, supra, 299 Conn. 467–68, quoting *New York* v. *Hill*, 528 U.S. 110, 114–15,120 S. Ct. 659, 145 L. Ed. 2d 560 (2000).

"Courts indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . do not presume acquiescence in the loss of fundamental rights." (Internal quotation marks omitted.) *State* v. *Shockley*, 188 Conn. 697, 707, 453 A.2d 441 (1982), quoting *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). "[A] waiver of a fundamental constitutional right is not to be presumed from a silent record." *State* v. *Shockley*, supra, 707, citing *Boykin* v. *Alabama*, 395 U.S. 238, 243, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). For a waiver to be effective, "it must be clearly established that there was an intentional relinquishment or abandonment of a known right or privilege." (Internal quotation marks omitted.) *Brookhart* v. *Janis*, 384 U.S. 1, 4, 86 S. Ct. 1245, 16 L. Ed. 2d 314 (1966).

Although it is a fundamental aspect of due process that the state must prove beyond a reasonable doubt each element of an offense, a defendant may concede that the state has sustained its burden of proof with respect to one or more elements. *State* v. *Cooper*, 38 Conn. App. 661, 669–70, 664 A.2d 773, cert. denied, 235 Conn. 908, 665 A.2d 903 (1995), cert. denied, 517 U.S. 1214, 116 S. Ct. 1837, 134 L. Ed. 2d 940 (1996). Connecticut courts have never required an express waiver of the right to require the state to prove each element of a crime. Id., 670.

Having examined the applicable principles of law, we turn to the facts that the state argues implicate waiver in the present case. While speaking to the jury during closing argument about the three elements the state must prove under § 53a-181 (a) (1), defense counsel stated in relevant part: "So, the judge is going to instruct you on a number of things. He's going to instruct you on the law about what—oh, one more thing on the breach of [the] peace. You also have to find that the inconvenience, annoyance and alarm that was caused by—all that going on with [the defendant] went on and actually caused alarm. *It has to be taking place in a public place, so I'll give you that. It was a public place. It was the New England Training School, New England Tractor Training School, and there* [*were*] *twenty-five people there.*

"You also have to find that it caused inconvenience, annoyance and alarm to the other twenty-five students. There is not testimony that that happened at all.

"All we heard was that they were there, but we didn't hear any testimony that any of them were alarmed, that any of them were upset. Nobody came in here to testify that they were. All we heard was Mr. Tarbox say, oh, they were there, that he was concerned about them, but there [were] no students who came and said that they were concerned, that they were upset." (Emphasis added.)

Defense counsel then stated: "And remember you've got to find each and every element be proven beyond a reasonable doubt—not just one, not just half of one—each and every element of the crime must be proven beyond a reasonable doubt in order to find somebody guilty."

Following the completion of defense counsel's closing argument, the state conducted its rebuttal closing argument. The state first argued: "Now, you just heard a lot from the defense attorney, and I'll start off with first the breach of [the] peace claim. The state does not have to make a showing there was an actual inconvenience, annoyance or alarm in the public, but rather just that the incident took place in a public location.

"In this case there was testimony that the incident with [Tarbox] and the defendant occurred at the New England Tractor Trailer School, where at least twenty-five other students were present, and I would argue that that is a public place." After the state finished delivering its rebuttal argument, the jury exited the courtroom and the court had a short discussion with the attorneys that did not involve the public place element. After a brief recess, the court called the jury back into the courtroom to receive jury instructions.[3]

The court instructed the jury in relevant part that, if "the state fails to meet its burden of proof as to one or more essential elements of that offense, the presumption of innocence alone will require that [the defendant] be found not guilty of that offense." The court also stated that "[a]ny argument or statement by a lawyer is not evidence."

When the court instructed the jury on the essential elements of § 53a-181 (a) (1), it stated that, "[i]f you were to find the defendant guilty of this offense the state must prove the following three [elements] beyond a reasonable doubt: (1) With intent to cause inconvenience, annoyance or alarm or recklessly creating a risk thereof; (2) [t]he defendant engaged in violent, tumultuous or threatening behavior; and (3) [t]hat the conduct occurred in a public place."

When instructing the jury regarding the third element, the court stated: "The third element the state must prove beyond a reasonable doubt is that the conduct occurred in a public place. Public place means any area that is used or held out for use by the public whether owned or operated by public or private interests." The

court concluded its instructions on this count by reminding the jury that the state was required to prove beyond a reasonable doubt all three elements, including that the offense occurred in a public place.

On appeal, the state argues that defense counsel's statement that the conduct "[had] to be taking place in a public place, so I'll give you that. It was a public place," was tantamount to a waiver by the defendant of his right to require the state to prove beyond a reasonable doubt the public place element of § 53a-181 (a) (1). In support of this argument, the state directs our attention to the defendant's failure to challenge the sufficiency of the evidence of the public place element in his motion for a judgment of acquittal, despite having raised such claims with respect to the other two elements of § 53a-181 (a) (1). The state asserts that by waiving the right to require the state to prove this element, the defendant's claim is unreviewable by this court.[4]

The defendant argues that defense counsel's remarks did not constitute a waiver of his constitutional right to be convicted only upon sufficient evidence. First, he asserts that he personally would have had to waive this right in order for the waiver to be valid. Second, he argues that defense counsel's statement did not constitute a waiver and, instead, could be viewed as "an *assumption* for the sake of an argument relating to the 'inconvenience' prong of the statute." (Emphasis in original.) Third, he contends that the court's jury instructions reflect that neither the state nor the court understood defense counsel's remarks to constitute a waiver and that, ultimately, the jury was instructed that the state bore the burden of proving each element of the offense beyond a reasonable doubt.

We conclude that this statement did not constitute an express waiver. First, the remarks made by defense counsel are ambiguous and reasonably may be construed to pertain to a different element of § 53a-181 (a) (1). At the time defense counsel made these remarks, she was discussing how the state must prove beyond a reasonable doubt that the defendant acted with the "intent to cause inconvenience, annoyance or alarm, or that he recklessly created a risk thereof . . . ." General Statutes § 53a-181 (a). As the defendant argues in his reply brief, defense counsel might have been assuming for the sake of argument that, even if the state had proved that the altercation occurred in a public place, it would still need to prove this other element. By noting that there were other students in the breakroom, defense counsel was focused on the effects of the defendant's actions on those around him to articulate why the state had not proven this element.

Further, defense counsel repeatedly stated that there were twenty-five people present, which demonstrates that her statement that "[i]t was a public place" arguably

pertained only to the portion of the alleged altercation that had occurred in the breakroom. Thus, even if we were to assume that defense counsel had intended to waive the defendant's right to challenge the sufficiency of the evidence as to the public place element, her remarks suggest that she had a misunderstanding of the meaning of "public place" within the statute, which only concerns a place's use and not merely the number of persons to which it is accessible. See General Statutes § 53a-181 (a) ("[f]or purposes of this section, 'public place' means any area that is used or held out for use by the public whether owned or operated by public or private interests"). The number of people present when an altercation occurs has no bearing on whether a place falls within this definition.

Second, even if the statement was unambiguous, neither the state nor the trial court recognized defense counsel's statement as a waiver. During the state's rebuttal closing argument, the prosecutor argued that the state had proved the public place element beyond a reasonable doubt. She made no mention of the supposed waiver that occurred just moments before. The court, in its instructions, articulated multiple times that the state was required to prove the public place element beyond a reasonable doubt. The court instructed the jury that one of the essential elements of the offense was that it occurred in a public place and provided the jury with the statutory definition of "public place," which removed any confusion that defense counsel's statement might have created. Additionally, the court reminded the jury that any statement by an attorney was not evidence. Neither the state nor the defendant objected to the court's instructions on this ground.

The state claims that defense counsel's statement was an explicit waiver, yet it relies on inapplicable cases in which our courts have found that defendants have made implicit waivers by failing to reject jury instructions that they later challenged on appeal. The state primarily discusses *State* v. *Cooper*, supra, 38 Conn. App. 669, a case in which a defendant, through counsel, implicitly waived his right to have the state prove beyond a reasonable doubt an element of a crime of which he was found guilty. In *Cooper*, the defendant was convicted under General Statutes § 14-227a (a) of operating a motor vehicle on Interstate 84 (I-84) while under the influence of alcohol. Id., 662–63. This statute required the state to prove beyond a reasonable doubt that the defendant had operated a vehicle on a public highway. Id., 666. To satisfy its burden, the state introduced evidence that the state Department of Transportation maintains I-84 and called a police sergeant to testify, without objection, that I-84 is a public highway. Id., 667–68. During closing arguments, the prosecutor stated, without objection, that there was uncontroverted evidence that the incident occurred on a public highway and told the jury that the judge would instruct

them that it was public. Id., 668. The trial court then instructed the jury "that the highway in question is a public highway. So you need not deal with that element and you need not make that finding." (Internal quotation marks omitted.) Id., 664. On appeal, the defendant claimed that the trial court improperly instructed the jury as to this element. Id.

*Cooper* is factually distinguishable from the present case. Here, as we will discuss in greater detail later in this opinion, the state produced no evidence that the altercation had occurred in a public place. On the contrary, there are several pieces of testimony that suggest that the area in question was not open to the public. Next, the prosecutor did not assert in her rebuttal closing argument that the defendant had conceded this element. Instead, she argued that the state had proven this element beyond a reasonable doubt. Finally, the defendant does not challenge the jury instructions, as they included detailed instructions concerning the element that the state now argues the defendant conceded at trial.

Defense counsel's remarks, whether viewed either in isolation or alongside the state's closing arguments and the court's jury instructions, do not demonstrate that the defendant intentionally relinquished or abandoned his right to have the state prove the public place element of § 53a-181 (a) (1) beyond a reasonable doubt. Accordingly, we are not persuaded that a waiver occurred.

II

We next address the defendant's claim that the evidence did not support a finding that the altercation with Tarbox occurred in a public place for purposes of § 53a-181 (a) (1).[5] We agree.

We begin by setting forth the standard of review for claims of evidentiary insufficiency in a criminal appeal. "The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the [finder of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [finder of fact] to conclude that a basic fact or an inferred fact is true, the [finder of fact] is permitted to consider the fact proven and may consider it in combination with

other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Dojnia*, 190 Conn. App. 353, 371–72, 210 A.3d 586, cert. granted on other grounds, 333 Conn. 914, 215 A.3d 1211 (2019).

Section 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place . . . ."

To prove a breach of the peace in violation of § 53a-181 (a) (1), the state must prove beyond a reasonable doubt that "(1) the defendant engaged in fighting or in violent, tumultuous or threatening behavior, (2) that this conduct occurred in a public place and (3) that the defendant acted with the intent to cause inconvenience, annoyance or alarm, or that he recklessly created a risk thereof." (Internal quotation marks omitted.) *State* v. *Colon*, 117 Conn. App. 150, 158, 978 A.2d 99 (2009). Section 53a-181 (a) defines "public place" as "any area that is used or held out for use by the public whether owned or operated by public or private interests."

We next turn to the evidence that is related to the disputed essential element. At trial, Tarbox testified that after he and the defendant left the breakroom, their altercation continued outside of a garage at the school. During cross-examination, the following exchange occurred between defense counsel and Tarbox:

"Q. You were outside your garage. Correct?

"A. Correct.

"Q. Well, were you backed up against the wall?

"A. We [were] in the corner of the building. The building is a—it's a corner and there's a door. The door is right there.

"Q. Well, you walked out with him and you were trapped?

"A. No. I started walking out into the parking lot.

"Q. Okay. So you started walking into the parking lot.

"A. And—

"Q. Okay.

"A. Because it's all open, the building, and then you come out the door and it's open but they park trucks to the left."

Tarbox also testified that he asked Lusty to come to the front of the garage through the student breakroom door, which was "by the garage." Lusty corroborated this testimony when he described the altercation by testifying in relevant part, "I went out into the front of the garage where [Tarbox] was standing and there was a student who was irate at the time and [Tarbox] was trying to get my attention."

During the state's direct examination, the following exchange occurred between the prosecutor and Tarbox:

"A. We have a special—we have a separate parking place for our vehicles because we work there versus students.

"Q. So when you say our vehicles, you mean the employees?

"A. The employees.

"Q. And you stated that the students walk through that parking lot?

"A. They walk by our vehicles all the time."

Additionally, Lusty testified during his direct examination that, after his conversation with the defendant in his supervisor's office, the defendant "started going toward the front of the garage, again . . . ." Lusty then stated, "I got [the defendant] into the front of the building and I asked him to leave the facility."

The defendant argues that the state introduced insufficient evidence to prove beyond a reasonable doubt that the defendant was in a "public place" during the altercation with Tarbox. He notes that the definition of "public place" in § 53a-181 (a) is concerned with how the property on which an incident takes place is used, and not with factors such as visibility to the public and the number of people present. He contends that the state introduced "no evidence" to prove that the breakroom or the area outside the garage were used or held out for use by the public. In fact, he argues, "safety concerns would be raised by allowing the public access to a tractor trailer garage area."

To bolster his argument, the defendant points to other statutes within our Penal Code, which we will discuss, that have broader definitions of "public place." He argues that these statutes demonstrate that, among other things, our legislature did not intend for § 53a-

181 (a) (1) to extend to all commercial settings. Instead, according to the defendant, it applies only to places "where any member of the public may freely enter without specific invitation, such as a public park, a road, a grocery store, a museum, or a shopping mall." He notes that General Statutes § 53a-182 (a) (1), Connecticut's disorderly conduct statute, covers the same conduct as § 53a-181 (a) (1), but also applies when the conduct occurs in nonpublic places. He adds that the plain and ordinary meaning of the word "public" confirms that a "public place" is one that must be held out for use by "all" in the "entire community."

The state argues that a jury could have reasonably found that the area in front of the school's garage met the definition of "public place" in § 53a-181 (a). Through its brief and its statements made at oral argument, the state concedes that the breakroom does not meet this definition. The state, however, points to Tarbox' testimony that the outdoor area where the altercation took place was "all open, the building and then you come out the door and it's open but they park trucks to the left." At oral argument before this court, the state conceded that this testimony was the only evidence proving that the area outside of the garage was a "public place." In its brief, the state emphasizes that there is no evidence that the property was "fenced in or that access was otherwise restricted in any way."

Because there is no Connecticut case law interpreting "public place" under § 53a-181 (a), the state relies on *State* v. *Cutro*, 37 Conn. App. 534, 657 A.2d 239 (1995), a case in which the defendant was convicted of public indecency in violation of General Statutes § 53a-186 (a) (2) for an incident that occurred in a mall parking lot. Id., 535–36. The state cites to cases from other states to strengthen its position that "parking lots on private property, open to the public, are public places," and that a key factor for courts to consider is a parking lot's "accessibility to the public."

In order to rule on the defendant's claim, we must interpret the term "public" that is defined in § 53a-181 (a). We begin by setting forth the guiding principles of statutory interpretation. General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *State* v. *Brown*, 310 Conn. 693, 702, 80 A.3d 878 (2013).

"[W]hen the statute being construed is a criminal

statute, it must be construed strictly against the state and in favor of the accused. . . . [C]riminal statutes [thus] are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant. . . . Rather, penal statutes are to be construed strictly and not extended by implication to create liability which no language of the act purports to create." (Citations omitted; internal quotation marks omitted.) *State* v. *LaFleur*, 307 Conn. 115, 126–27, 51 A.3d 1048 (2012).

The legislature expressly intended § 53a-181 (a) (1) to apply only to conduct that occurs on property "used or held out for use by the public . . . ." Despite the fact that the legislature defined "public place" as that term is used in § 53a-181 (a) (1), it did not define the word "public." "In the absence of a definition of terms in the statute itself, [w]e may presume . . . that the legislature intended [a word] to have its ordinary meaning in the English language, as gleaned from the context of its use. . . . Under such circumstances, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *Efstathiadis* v. *Holder*, 317 Conn. 482, 488, 119 A.3d 522 (2015), quoting *State* v. *LaFleur*, supra, 307 Conn. 128. Thus, looking at the plain and ordinary meaning of the word "public" sheds light on the definition of "public place" as it applies to § 53a-181 (a). When used as an adjective, Black's Law Dictionary defines "public" as: "1. Of, relating to, or involving an entire community, state, or country. 2. Open or available for all to use, share, or enjoy. 3. (Of a company) having shares that are available on an open market." Black's Law Dictionary (11th Ed. 2019), p. 1483. As the defendant notes in his brief, the plain and ordinary meaning of "public" confirms that the legislature intended for § 53a-181 (a) (1) to apply only to conduct that occurs on property that is held out for use by all members of the public, not just select groups.

Section 1-2z next directs us to look at the relationship of § 53a-181 (a) (1) to other statutes. The relationship between § 53a-181 (a) (1) and other statutes further reveals the legislature's intended meaning of the word "public." The term "public place" appears in four other sections of the penal code. General Statutes § 53a-180aa (a), which defines breach of the peace in the first degree, uses the same definition as that used in § 53a-181 (a). Section 53a-182 (a) (6), which defines disorderly conduct, uses the term "public place," but does not define it. The two remaining statutes, which we will discuss, illustrate why the legislature's use of "public place" in § 53a-181 (a) (1) is narrower in scope than the state argues.

First, § 53a-186 (a), Connecticut's public indecency statute, defines "public place" as "any place where the conduct may reasonably be expected to be viewed by

others." This statute criminalizes the performance of certain lewd acts in a public place, which presumably is why the definition focuses on the visibility of the place where the acts take place, rather than the place's use. If the legislature intended § 53a-181 (a) (1) to extend to conduct that occurs within view of members of the public, it could have included similar language in the statute's definition. Instead, we may presume from the definition applicable to § 53a-181 (a) (1) that the legislature was not concerned with this characteristic for the purpose of breach of the peace.

Second, General Statutes § 53a-189c criminalizes the unlawful dissemination of an intimate image. Subsection (b) of § 53a-189c provides that the provisions of subsection (a) do not apply to, inter alia, "[a]ny image . . . of such other person if such image resulted from voluntary exposure or engagement in sexual intercourse by such other person, in a public place, as defined in section 53a-181, *or in a commercial setting* . . . ." (Emphasis added.) "We presume that the legislature did not intend to enact meaningless provisions. . . . [S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . ." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 126. The addition of the phrase "or in a commercial setting" reflects that the legislature recognized that there are commercial settings that are not used or held out for use by the public. We may presume that, if the legislature intended for § 53a-181 (a) to apply to conduct in all commercial settings, it would have included this clause or similar language in the statute's definition.

The legislature enacted § 53a-182 (a) (1) to cover altercations that occur in commercial settings that are not used or held out for use by the public. This subsection, which criminalizes disorderly conduct, mirrors the language of § 53a-181 (a) (1), but does not contain the term "public place." See *State* v. *Taveras*, 183 Conn. App. 354, 376 n.17, 193 A.3d 561 (2018) ("[w]e note that elements of breach of the peace in the second degree are identical to the elements of disorderly conduct, except that breach of the peace in the second degree requires that the proscribed conduct occur in a public place"). In *State* v. *Indrisano*, 228 Conn. 795, 799–800, 640 A.2d 986 (1994), for example, the defendant was convicted of disorderly conduct under § 53a-182 (a) (1) for an altercation that took place in the common area of an office space that the victim shared with another tenant. The existence of the disorderly conduct statute further illustrates that § 53a-181 (a) (1) does not cover commercial settings that are not open to the public.

On the basis of the text of § 53a-181 (a), its relationship to other statutes, and the plain meaning of the word "public," we are persuaded that the meaning of the term "public place" is plain and unambiguous and

does not yield absurd or unworkable results. It is therefore not necessary for us to look to extratextual evidence of its meaning.

The cases that the state cites in support of its interpretation of the statute are unpersuasive. *Cutro*, the main case on which the state relies, is inapplicable to the case before us, as it involves a different statute with its own definition of "public place." *State* v. *Cutro*, supra, 37 Conn. App. 535. As we discussed previously, the defendant in *Cutro* was convicted of public indecency in violation of § 53a-186 (a) (2), which defines "public place" as "any place where the conduct may reasonably be expected to be viewed by others." Id., 535 n.1. This court, in *Cutro*, reasoned that the jury had sufficient evidence from which it could conclude that the defendant's automobile, which was parked in a mall parking lot, met this definition. Id., 543–44. It does not follow, however, that every parking lot is a public place. The state must still prove that the lot is used or held out for use by the public. If anything, *Cutro* weakens the state's argument by highlighting the contrast between this definition and the definition contained within § 53a-181 (a).

We are not persuaded by the out-of-state cases that the state cites, as the cases apply different breach of the peace statutes and do not shed light on the meaning of § 53a-181 (a). The state does not indicate if these statutes define "public place," nor does it attempt to articulate how the statutes are analogous to § 53a-181 (a). Thus, these cases do not add to what we can glean from the definition of "public place" in § 53a-181 (a), this definition's relationship to other definitions of "public place" within the Penal Code, and the plain meaning of the word "public."

We turn now to the defendant's claim that the state did not produce sufficient evidence to prove the "public place" element in § 53-181 (a) (1) beyond a reasonable doubt. When construing the evidence in the light most favorable to sustaining the verdict, we are unable to conclude that a jury could have reasonably found that the area outside of the garage was a public place.

The state produced no evidence showing that this area was used or held out for use by the public. The prosecutor did not ask its witnesses for details about this area, such as whether prospective students or other members of the public used it to park. The state did not proffer into evidence maps or photographs to demonstrate that entry to the area was unrestricted. Instead, the jury was left to speculate about the characteristics of the location.

The only evidence that the state can point to is Tarbox' testimony that the area in front of the garage was "all open." This testimony is ambiguous because it is unclear what Tarbox was referencing when he used the

phrase "all open." It is unreasonable to infer from this vague language that Tarbox meant that the area was accessible by members of the public generally, rather than just to students and staff of the school. He made this comment after clarifying that he was in the corner of the building, but not trapped near the wall. He proceeded to say that he walked into the parking lot. Thus, he could have been explaining that he and the defendant were outside of the building, as opposed to the doorway through which they came and the garage outside of which they stood. It is also unclear if Tarbox was describing the character of the parking lot itself, as opposed to its openness to the public. The parking lot could have been large and physically open to accommodate the trucks parked to the left, but contained signs, fencing, or a gate to restrict public access.

When viewing Tarbox' "all open" comment alongside other testimony, it is even more probable that a jury could have inferred that the area outside of the garage was not open to the public. First, Tarbox testified that employees had their own parking lot, which meant that there were multiple parking lots on the school's premises. Further, the existence of a parking lot that was "all open," except for trucks parked on the left, could imply that the roughly twenty-five students who were at the school at the time were not allowed to park there. One possible explanation is that this parking lot was only for tractor trailers. Second, Tarbox' testimony about these trucks indicates that vehicles, presumably tractor trailers, drove through that particular parking lot, and possibly in and out of the garage. Thus, it is reasonable to infer that there would be a large area that was "all open" for drivers to maneuver these trucks. When combined with Tarbox' testimony that the incident occurred in front of the garage, and Lusty's testimony corroborating this statement, one could reasonably infer that the school had an interest in keeping members of the public away from this area. Third, Lusty's testimony that he led the defendant to the front of the building before asking him to leave suggests that the garage area did not have a means of egress. Without more evidence, a jury could not reasonably draw the inference that the school held out this area for use by the public.

The cumulative force of the state's evidence, even when viewed in the light most favorable to sustaining the verdict, was insufficient to establish beyond a reasonable doubt that the area in which the altercation occurred was a public place as required by § 53a-181 (a) (1). For the foregoing reasons, we conclude that there is no reasonable view of the evidence that supports the jury's verdict of guilty.

"[A] defendant convicted on the basis of insufficient evidence is entitled to a judgment of acquittal." *State* v. *Soto*, 175 Conn. App. 739, 746, 168 A.3d 605, cert.

denied, 327 Conn. 970, 173 A.3d 953 (2017). Therefore, we must reverse the judgment of conviction.

The judgment is reversed and the case is remanded with direction to render a judgment of acquittal.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] Although defense counsel, in connection with the motion for judgment of acquittal, argued that the evidence was insufficient to support a conviction for breach of the peace in violation of § 53a-181 (a) (1), he did not advance the argument raised in claim one of this appeal, namely, that the state did not prove beyond a reasonable doubt that the incident occurred in a public place.

[2] At trial, the state's theory of the case on this count focused on the defendant's altercation with Tarbox, not with Lusty. The state's closing argument solely addressed the defendant's conduct toward Tarbox and only cited Lusty's testimony to corroborate Tarbox' account of the events. Similarly, the jury instructions on this count directed the jury's attention only to the defendant's conduct toward Tarbox.

"We assume that the fact finder is free to consider all of the evidence adduced at trial in evaluating the defendant's culpability, and presumably does so, regardless of whether the evidence is relied on by the attorneys. . . . When the state advances a specific theory of the case at trial, however, sufficiency of the evidence principles cannot be applied in a vacuum. Rather, they must be considered in conjunction with an equally important doctrine, namely, that the state cannot change the theory of the case on appeal." (Citation omitted; internal quotation marks omitted.) *State* v. *Carter*, 317 Conn. 845, 853–54, 120 A.3d 1229 (2015). Before this court, the defendant and the state focus their analysis on the defendant's conduct toward Tarbox. Thus, consistent with the state's theory of the case at trial as well as the arguments advanced on appeal, we likewise focus our analysis on whether the evidence was sufficient to prove beyond a reasonable doubt that the altercation with Tarbox occurred in a public place.

[3] During oral argument before this court, the state contended that the trial court instructed the jury about the public place element because the court gave its jury instructions immediately after the state finished its rebuttal. Therefore, the state argued, there was no opportunity for the trial court to reconfigure the jury instructions to account for the alleged waiver. The discussion between the trial court and the attorneys that took place after the state's rebuttal argument, along with the brief recess thereafter, undermines this contention.

[4] The state also argues that the defendant does not satisfy the third prong of *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Kitchens*, supra, 299 Conn. 466–67.

"A defendant in a criminal prosecution may waive one or more of his or her fundamental rights. . . . [I]n the usual *Golding* situation, the defendant raises a claim on appeal [that], while not preserved at trial, at least was not waived at trial. . . . [A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial . . . ." (Citation omitted; internal quotation marks omitted.) Id., 467.

Because we find that the defendant did not waive his claim at trial, it is not necessary for us to determine whether the defendant met this prong of *Golding*.

[5] The record reflects that the defendant did not preserve this sufficiency claim for appellate review. The claim is nonetheless reviewable on appeal. See *State* v. *Lewis*, 303 Conn. 760, 767 n.4, 36 A.3d 670 (2012) ("To the extent that the defendant's sufficiency claims were unpreserved, we observe that 'any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of [*State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)]. There being no practical significance, therefore, for engaging in a *Golding* analysis of an insufficiency of the evidence claim, we will review the defendant's challenge to his conviction . . . as we do any properly preserved claim.' *State* v. *Adams*, 225 Conn. 270, 276 n.3, 623 A.2d 42 (1993).").